ORIGINAL

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

FILED
JUN 2 2 2006
U.S. COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| **GOLDEN FEATHER REALTY SERVICES, INC.** **Plaintiff,** v. **THE UNITED STATES OF AMERICA,** **Defendant.** | ) | **No.** 06-479 C **Judge** |

**COMPLAINT**

Plaintiff Golden Feather Realty Services, Inc. ("GFR"), for its Complaint against Defendant, the United States of America, alleges as follows:

**NATURE OF THIS ACTION**

1. This is an action against the United States for damages resulting from the Defendant's breach of two U.S. Department of Housing and Urban Development ("HUD") contracts with GFR.

2. The two contracts were "indefinite quantity" contracts that required HUD to order a guaranteed minimum quantity of management and marketing services for certain HUD properties. The United States breached the contracts by failing to order the guaranteed minimum quantities established in each contract.

3. As a result of the breaches, the United States is liable to GFR for more than $23 million in damages, plus interest, costs, and fees.

## JURISDICTION

4. This Court has jurisdiction over the subject matter of this action pursuant to the Tucker Act, 28 U.S.C. § 1491, and the Contract Disputes Act, 41 U.S.C. §§ 601-613.

## THE PARTIES

5. Plaintiff is a Texas corporation with its principal place of business in San Antonio, Texas. Plaintiff is a closely-held business that has elected for federal income tax purposes to be treated as a "Subchapter S Corporation" under the Internal Revenue Code, 26 U.S.C. §§ 1361-1379.

6. Defendant is the United States of America, acting principally through HUD.

## FACTS

### Nature And Scope Of The Contracts

7. On February 1, 1999, HUD awarded Contract No. C-OPC-21322 ("Contract C1") and Contract No. C-OPC-21336 ("Contract C2") (collectively referred to herein as "the Contracts") to GFR. The Contracts required GFR to provide management and marketing ("M&M") services for single family properties owned by or in the custody of HUD. Contract C1 also required GFR to provide M&M services for multi-family properties.

8. The primary objectives of the Contracts were to ensure that: (1) properties that were in the process of foreclosure, but not yet owned by HUD (the mortgagee), were protected and preserved pending conveyance to HUD; (2) properties that were owned by HUD (by reason of payment of an insurance claim) were protected and preserved, properly managed, evaluated, and marketed to produce the highest possible return to HUD's mortgage insurance funds; (3) properties for which HUD had accepted an offer to purchase were promptly closed and, if not, returned to the sales market at an early date; (4) HUD's net sales proceeds were promptly wired

to its Treasury account; (5) average losses on sales and the average time properties remained in inventory were reduced; and (6) the overall program, and the image of HUD's properties, was positive and complaints were minimal.

9. HUD issued the Contracts pursuant to a competition conducted under Request for Proposals No. R-OPC-21230 ("Solicitation"). Several other contracts also were issued under the Solicitation, with each contract covering a designated geographic service area under one of four HUD Home Ownership Centers ("HOCs").

10. Contract C1 covered Santa Ana HOC Area One, which was comprised of eleven counties in southern California.

11. Contract C2 covered Santa Ana HOC Area Two, which was comprised of forty-seven counties in northern California and fifteen counties in Nevada.

12. The remaining contracts awarded under the Solicitation covered fourteen other geographical service areas spread throughout the United States.

13. No area was covered by more than one contract and, accordingly, no other contract covered the geographic service areas covered by Contract C1 or Contract C2.

**Contract Performance Periods**

14. The Contracts provided for one Base Year of performance with four one-year options and an additional option period of up to six months (the "Extended Service Period").

15. HUD exercised all four one-year options as well as the six-month Extended Service Period for each of the Contracts.

16. The Base Year under each of the Contracts began on February 1, 1999 and ended on January 31, 2000.

17. The first one-year option under each of the Contracts ("Option Year 1") began on February 1, 2000 and ended on January 31, 2001.

18. The second one-year option under each of the Contracts ("Option Year 2") began on February 1, 2001 and ended on January 31, 2002.

19. The third one-year option under each of the Contracts ("Option Year 3") began on February 1, 2002 and ended on January 31, 2003.

20. The fourth one-year option under each of the Contracts ("Option Year 4") began on February 1, 2003 and ended on January 31, 2004.

21. The Extended Service Period under each of the Contracts began on February 1, 2004 and ended on July 31, 2004.

22. In addition to the Base Year, the four one-year options, and the six-month Extended Service Period, the Contracts provided for a transition period during which GFR would furnish phase-in services as the work was transferred to any successor contractors (the "Transition Out Period").

23. The Transition Out Period under Contract C1 began on August 1, 2004 and ended on October 1, 2004.

24. The Transition Out Period under Contract C2 began on August 1, 2004 and ended on December 13, 2004.

**Contract Pricing**

25. The Contracts provided that GFR would be paid at fixed unit prices for each contract line item, except that GFR would be reimbursed its actual costs for services specifically identified in the Contracts as "pass through" expenses.

26. The Contracts identified three categories of properties for pricing purposes: (1) HUD-Owned Properties; (2) Custodial Properties (properties that were in the process of foreclosure, but not yet owned by HUD (the mortgagee)); and (3) Rental Properties. Each category had a separate basis for the calculation of the payments that HUD would make to GFR.

27. For HUD-Owned Properties, GFR generally was to receive two payment installments: first, when each property was initially listed for sale; and, second, when the sale of each property was closed and reconciled. The first payment installment was calculated as 30% of the product of (1) the listing price and (2) the applicable price factor. The second payment installment was calculated as the product of (1) the net sales price and (2) the applicable price factor, less the first payment.

28. Contract C1, as amended, included a price factor of 3.4% for the Base Year and Option Years 1 and 2 and a price factor of 3.47% for the remaining performance periods.

29. Contract C2, as amended, included a price factor of 3.5% for the Base Year and Option Years 1 and 2 and a price factor of 3.5383% for the remaining performance periods.

30. For Custodial Properties, GFR was to receive a fixed monthly payment for each assigned property.

31. For Rental Properties, GFR generally was to receive a specified percentage of the rent that it collected.

32. The total value of the work ordered under Contract C1, as amended, was approximately $161 million.

33. The total value of the work ordered under Contract C2, as amended, was approximately $44 million.

**Guaranteed Minimum Quantities Under The Contracts**

34. The Contracts were indefinite quantity contracts as defined in Federal Acquisition Regulation ("FAR") 16.504 and FAR Clause 52.216-22.

35. The Contracts required HUD to order at least the minimum quantities identified in Section J, "Minimum/Maximum Order Quantities."

36. Under Contract C1 as originally executed, Section J guaranteed GFR that HUD would order at least 13,500 properties in the Base Year and at least 9,000 properties "each subsequent year."

37. Under Modification No. M0035 to Contract C1, HUD reduced the minimum quantity for Option Year 4 from 9,000 properties to 3,500 properties.

38. Under Contract C2 as originally executed, Section J guaranteed GFR that HUD would order at least 3,900 properties in the Base Year and at least 2,600 properties "each subsequent year."

39. Under Modification No. M0034 to Contract C2, HUD reduced the minimum quantity for Option Year 4 from 2,600 properties to 1,000 properties.

40. In exercising the option for the Extended Service Period for each of the Contracts, GFR and HUD agreed that the contractual terms as they existed during Option Year 4 would remain "in full force and effect" during the Extended Service Period.

41. Accordingly, under Contract C1, the minimum quantity for the six-month Extended Service Period was 1,750 properties, which is 50% of the minimum quantity of 3,500 properties for Option Year 4.

42. Similarly, under Contract C2, the minimum quantity for the six-month Extended Service Period was 500 properties, which is 50% of the minimum quantity of 1,000 properties for Option Year 4.

43. In issuing the task order to implement the modification for the Transition Out Period for each of the Contracts, HUD provided that performance during the Transition Out Period would be "governed by the terms of the basic contract" and the Transition Out Period modification.

44. The modification for the Transition Out Period for each of the Contracts provided that new case assignments from the mortgagees to GFR would cease on the 61st day after the award of follow-on contracts to new M&M contractors.

45. In fact, new case assignments to GFR under both of the Contracts ceased on September 29, 2004, two months into the Transition Out Period.

46. Accordingly, under Contract C1, the minimum quantity for the two-month Transition Out Period was 585 properties, which is 16.7% of the minimum quantity of 3,500 properties for Option Year 4.

47. Similarly, under Contract C2, the minimum quantity for the two-month Transition Out Period was 167 properties, which is 16.7% of the minimum quantity of 1,000 properties for Option Year 4.

**Quantities Actually Ordered By HUD Under The Contracts**

48. During the Base Year and Option Year 1 for each of the Contracts, HUD ordered more than the minimum quantities.

49. During Option Year 2, Option Year 3, Option Year 4, the Extended Service Period, and the Transition Out Period for each of the Contracts, HUD ordered fewer than the minimum quantities.

50. For Contract C1, HUD ordered only 6,711 properties during Option Year 2, which is 2,289 properties less than the minimum quantity of 9,000 properties.

51. For Contract C1, HUD ordered only 4,309 properties during Option Year 3, which is 4,691 properties less than the minimum quantity of 9,000 properties.

52. For Contract C1, HUD ordered only 1,519 properties during Option Year 4, which is 1,981 properties less than the minimum quantity of 3,500 properties.

53. For Contract C1, HUD ordered only 154 properties during the Extended Service Period, which is 1,596 properties less than the minimum quantity of 1,750 properties.

54. For Contract C1, HUD ordered only 23 properties during the Transition Out Period, which is 562 properties less than the minimum quantity of 585 properties.

55. For Contract C2, HUD ordered only 2,503 properties during Option Year 2, which is 97 properties less than the minimum quantity of 2,600 properties.

56. For Contract C2, HUD ordered only 1,729 properties during Option Year 3, which is 871 properties less than the minimum quantity of 2,600 properties.

57. For Contract C2, HUD ordered only 929 properties during Option Year 4, which is 71 properties less than the minimum quantity of 1,000 properties.

58. For Contract C2, HUD ordered only 160 properties during the Extended Service Period, which is 340 properties less than the minimum quantity of 500 properties.

59. For Contract C2, HUD ordered only 36 properties during the Transition Out Period, which is 131 properties less than the minimum quantity of 167 properties.

**The Claims**

60. On January 10, 2005, GFR submitted claims to the HUD Contracting Officer for damages resulting from HUD's failure to order the minimum quantities during Option Year 2, Option Year 3, Option Year 4, the Extended Service Period, and the Transition Out Period for each of the Contracts (the "Claims").

61. In the Claims, GFR asserted that that it was entitled to damages in the amounts of $22,049,537 under Contract C1 and $1,767,203 under Contract C2, for a total amount of $23,816,740. These damages represent lost profits associated with the guaranteed minimum quantities that HUD failed to order under the Contracts.

62. GFR calculated these lost profits for each of the Contracts by: (1) determining, in accordance with the pricing methodology identified in the Contracts for HUD-Owned Properties, the revenues that GFR would have earned from the unordered guaranteed quantities during each of the relevant performance periods; and (2) determining what portion of these "lost revenues" represented lost profits, and what portion represented avoided costs of performance, by multiplying (a) the lost revenues for each performance period by (b) the actual profit percentage realized by GFR for the work it performed during that period for the quantities that HUD ordered.

63. In other words, GFR conservatively assumed that, for each performance period under each of the Contracts, GFR would have realized the same profit percentage for the guaranteed quantities that HUD failed to order as GFR realized for the quantities that HUD did order.

64. During Option Year 2, Option Year 3, Option Year 4, the Extended Service Period, and the Transition Out Period, no Rental Properties and very few Custodial Properties

were assigned to GFR under either of the Contracts. Accordingly, GFR based the Claims upon the assumption that all of the unordered guaranteed quantities would have fallen in the HUD-Owned Properties category.

65. Following the submission of the Claims, GFR made its records available to the Defense Contract Audit Agency ("DCAA"). GFR also engaged in written discussions with HUD and the DCAA regarding the merits of the Claims and GFR's methodology for calculating lost profits.

## The Final Decision

66. On March 3, 2006, HUD issued a Final Decision denying the Claims in their entirety.

## COUNT I

### (Breach of Contract C1)

67. Paragraphs 1 through 66 are incorporated by reference as if set forth fully herein.

68. Under an indefinite quantity contract, the Government is required to specify the minimum and maximum quantities that it will acquire under the contract, and it is obligated to order at least the minimum quantity from the contractor. When the Government fails to order the minimum quantity identified in an indefinite quantity contract, it has breached the contract and the contractor is entitled to damages.

69. In cases where, as here, an indefinite quantity contract establishes separate minimum quantity requirements for individual performance periods, including option periods, the Government is obligated to order the minimum quantities identified in each period, and it is liable for breach of contract damages for each period in which it fails to order the required minimum, regardless of whether it ordered more than the required minimum in other periods.

70. By failing to order the minimum quantities for Contract C1 in Option Year 2, Option Year 3, Option Year 4, the Extended Service Period, and the Transition Out Period, the United States breached Contract C1.

71. As a result of these breaches of Contract C1, the United States is liable to GFR in the amount of at least $22,049,537.

**COUNT II**

**(Breach of Contract C2)**

72. Paragraphs 1 through 71 are incorporated by reference as if set forth fully herein.

73. By failing to order the minimum quantities for Contract C2 in Option Year 2, Option Year 3, Option Year 4, the Extended Service Period, and the Transition Out Period, the United States breached Contract C2.

74. As a result of these breaches of Contract C2, the United States is liable to GFR in the amount of at least $1,767,203.

**PRAYER FOR RELIEF**

Plaintiff GFR seeks the following relief against the United States:

A. Judgment awarding GFR damages in the amount of at least $23,816,740;

B. Accrued interest pursuant to 41 U.S.C. § 611;

C. Such costs, expenses, and attorneys fees as are available under applicable law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and

D. Such other relief as the Court deems appropriate.

Respectfully submitted,

James J. McCullough
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, DC 20004-2505
TELEPHONE: 202-639-7000
FACSIMILE: 202-639-7003

Counsel to Plaintiff Golden Feather Realty Services, Inc.

OF COUNSEL:

Deneen J. Melander
Steven A. Alerding
FRIED, FRANK, HARRIS, SHRIVER
& JACOBSON LLP
1001 Pennsylvania Avenue, N.W., Suite 800
Washington, DC 20004-2505
TELEPHONE: 202-639-7000
FACSIMILE: 202-639-7003

June 22, 2006

*277744 v2*